USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
JODA, LLC,

                             Plaintiff,

         -against-                  06 Civ. 3043 (DAB)
                                            MEMORANDUM & ORDER

AVIATION SERVICES INTERNATIONAL,
LLC, f/k/a GE-IAI AVIATION SERVICES
INTERNATIONAL, LLC,

                             Defendant.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.

      Plaintiff JODA, LLC ("JODA") brings suit against Defendant Aviation Services International, LLC, ("ASI") for breach of contract, alleging Defendant's failure to notify Plaintiff of the termination of its T3 Agreement with non-party Southeast, as required by the terms of the Defendant's letter agreement with Southeast, dated September 18, 2001. ("The Letter Agreement.") Plaintiff now moves for partial summary judgment on the issue of liability as to its breach of contract claim. Because the Court finds a genuine issue of material fact as to the existence of damages, Plaintiff's Motion for Summary Judgment is DENIED.

## I. BACKGROUND

      Plaintiff, JODA, LLC ("JODA") is a Missouri limited liability corporation in the business of providing aircraft financing. (Compl. ¶¶ 1, 5.)  Defendant Aviation Services

International, LLC ("ASI"), formerly known as "GE-IAI-ASI"[1] (Guttman Decl. ¶ 5.), is a wholly-owned indirect subsidiary of Israel Aerospace Industries Ltd. ("IAI"), a comprehensive aerospace company engaged in the manufacture, conversion and repair of civilian and military aircraft. (Guttman Decl. ¶¶ 1, 2.) In or about January 2001, JODA financed Southeast Airlines, Inc. ("Southeast") in acquiring two DC9-31 commercial aircraft for Southeast's passenger operations ("Joda Aircraft"). (Compl. ¶ 6.)

The transaction included a Loan Security Agreement, under which Southeast was required to pay JODA certain "engine reserves" payments for engine maintenance. (Stone Decl., Ex. A, §§ R, S) ("The Security Agreement.") Further, JODA established a fund, available to Southeast "solely to pay for engine overhauls, or airworthy replacement engines with time remaining." (Security Agreement, § R.) Under Section S, Southeast could not apply the engine reserves to the "cost of any rental engine, payment of which expenses, premiums, and costs shall be the sole

---

[1] In 1999, IAI and General Electric Engine Services ("GEES") began a joint venture and formed GE-IAI Aviation Services International, LLC ("GE-IAI-ASI"). (Guttman Decl. ¶ 5.) In 2002, GEES departed from the joint venture and transferred all of its outstanding shares in GE-IAI-ASI to IAI. (Guttman Decl. ¶ 19.) In or about March 2002, GE-IAI-ASI changed its name to ASI, Defendant herein. (Guttman Decl. ¶ 19.)

responsibility of [Southeast]." (Security Agreement, § S.) Further, engine reserves could not be used to defray the cost of maintenance and repairs other than engine overhauls. (Security Agreement, § S.)

In or about July 18, 2001, Defendant entered into the T3 Agreement - a "one-stop" comprehensive maintenance program - with Southeast. (Kolatch Aff., Ex. D (the "T3 Agreement"); (Guttman Decl. ¶ 9-17.) The T3 Agreement had four components: airframe maintenance and repair; component maintenance and repair; component consignments; and engine maintenance and repair. (Guttman Decl. ¶ 11).

In pertinent part, Article II(2)(A) of the T3 Agreement provides: "Term: This Agreement . . . unless sooner terminated pursuant to Section 7 of Appendix F herein, shall remain in effect (i) with respect to each MD Aircraft, for a period of seven (7) years; and (ii) with respect to each DC Aircraft, for a period of five (5) years." (T3 Agreement, Art. II(2)(A), at 23.)

In turn, Section 7(A) of Appendix F provides for Southeast's extension of the term of the Agreement, while Section 7(B) of Appendix F to the T3 Agreement provides that "GE-IAI may, at its option, immediately cancel all or any portion of this Agreement, if Customer: (A) fails to make any of the required payments when due, unless cured within ten (10) calendar days of its payment

due date . . . (T3 Agreement, App. F, Sec. 7(A) & (B), at 46). Finally, Section 7(C) of Appendix F provides that "[w]ithout limiting the above provisions and excluding any other remedies provided elsewhere in this Agreement, either Party may cancel this Agreement upon ninety (90) calendar days written notice to the other for failure to comply with any material provision of this Agreement . . . " (T3 Agreement, App. F, Sec. 7(C), at 46.)

At the time of the T3 Agreement, Thomas Guttman "served as managing director of GE-IAI-ASI" and worked out of Defendant's headquarters in Israel. (Guttman Decl. ¶¶ 6, 7). Diane Beamer "held the title of president" of GEES and worked out of GEES' headquarters in Cincinnati, Ohio. (Guttman Decl. ¶¶ 6, 7)

On September 18, 2001, Defendant's President, Diane Beamer, sent the so-called Letter Agreement to Charles J. Hellier, Vice President and CFO of Southeast Airlines. JODA is not listed as a recipient, and only Diane Beamer's signature appears on the Letter Agreement. (See Letter Agreement.)

The first sentence of the Letter Agreement states: "Per [Southeast's] request, GE-IAI is providing … the following concession in exchange for [JODA's] consent to waive engine reserve requirements under the Security Agreement to Southeast Airlines, Inc. for the [JODA Aircraft]. (Letter Agreement.)

Under Paragraph 1, Defendant was to provide JODA a "written

4

notice of [Southeast's] default under the [T3 Agreement]," at least thirty days prior to any action by Defendant terminating the T3 Agreement.  (Letter Agreement, ¶ 1.)

Paragraph 2 provides that in the event of Southeast's default, Defendant was to provide JODA the "right to cure said default during the thirty day period."  Further, upon JODA's cure of Southeast's default and termination of Southeast's contract rights, Defendant was to transfer to JODA "all rights to service under the contract subject to [JODA's] assumption of the obligations thereunder."  (Letter Agreement, ¶ 2.)

The Letter Agreement also provides under Paragraph 3 that if JODA was to take possession of the JODA Aircraft due to Southeast's default, then Defendant would "allow [JODA] to assume the [T3 Agreement] in [its] complete form for the remaining term of the original [T3 Program]," subject to JODA curing all defaults of Southeast and Defendant adjusting pricing.  (Letter Agreement, ¶ 3.)

Paragraph 4 provides that, in the event that JODA transferred title or the right to operate the JODA Aircraft to a third party, JODA would provide GE-IAI with notice and GE-IAI would allow that third party to assume the T3 Agreement.  In addition, in the event of such a contingency, Paragraph 4 provides for JODA to become the third party's guarantor if its

credit is not equal to that of Southeast and for a potential modification to the pricing under the deal based upon the third party's operating parameters. (Letter Agreement, ¶ 4.)

Finally, the Letter Agreement provides in Paragraph 5 that in the event that JODA repossesses and sells or leases the JODA Aircraft due to a default of Southeast under the Letter Agreement, the Letter Agreement will otherwise "maintain [the] terms and conditions of the [T3 Agreement]". (Letter Agreement, ¶ 5.)

Plaintiff JODA contends, and Defendant ASI disputes, that it would have been "extremely costly, and largely redundant" for Southeast to pay both engine reserves to JODA and T3 monthly payments to ASI. (Pl. 56.1 Stmt. ¶ 13.) ASI contends that while there was some small overlap between the engine reserves and the T3 monthly payments, if Southeast did not pay the engine reserves to JODA, the reserves would have been used to pay the principal owed by Southeast to JODA, and thus would not have been redundant. (Def. Counter-Stmt. ¶ 13.)

Plaintiff JODA further alleges that prior to the execution of the Letter Agreement, Southeast requested that JODA waive the reserve requirement under the Security agreement. (Pl. 56.1 Stmt. ¶ 14.) As a condition of waiver, JODA required promises by GE-IAI, as stated in the Letter Agreement. (Pl. 56.1 Stmt. ¶

6

15.)

Defendant's managing director, Guttman contends that he would have been aware of any actual legal obligation incurred by Defendant and that he had not seen the Letter Agreement until several months before the present lawsuit was filed. (Guttman Decl. ¶ 22-23.) "To the best of [Guttman's] recollection," the only signatory, Diane Beamer left Defendant in October or November of 2001. Her whereabouts are unknown to Guttman. (Guttman Decl. ¶ 18.)

In 2003, Defendant filed an action against Southeast in the Supreme Court of New York, based on Southeast's default, (Compl. ¶ 15), alleging that Southeast owed it more than five million dollars, (Sugrue Aff., Ex. A at 2), up to and through February of 2003, (Kolatch Aff., ¶ 21.) On April 7, 2003, Defendant sent Southeast a letter referencing the T3 Agreement and noting that the "purpose of this letter is to provide written confirmation of the termination and cancellation of the Agreement pursuant to Section (7)(B) of Appendix F, as a result of your failure to make required payments when due." (Sugrue Aff., Ex. D.)

In resolving the Motion to Dismiss in that case, the Honorable Charles E. Ramos wrote in a January 16, 2004 Order that:

> [i]n a letter dated April 7, 2003, <u>IAI terminated the Agreement with Southeast</u> pursuant to Section 7(B) of Appendix F which, in relevant part, states that "GE-IAI may, at its option, immediately cancel all or any portion of this Agreement, if Customer: (A) fails to make any of the required payments when due, unless cured within ten (10) calendar days of its payment due date."

(Sugrue Aff., Ex. A at 2) (emphasis added.)

Further, on December 8, 2004 Defendant's counsel, Sari Kolatch, who also submitted an affidavit in this matter, provided an opening statement to the jury in its litigation against Southeast. During that statement, Kolatch stated that: "On April 7, 2003, Israel Industries, on behalf of ASI, by their in-house counsel, <u>Israel Aircraft Industries sent a termination</u> pursuant to the contract <u>officially terminating the contract</u>, and they have never heard from Southeast again." (Sugrue Aff., Ex. B at 43:5-12) (emphasis added).

Subsequently, later that day during the trial, Thomas Guttman testified in the Supreme Court that as a manager of IAI, he had decided to terminate the T3 Agreement:

> Q. Okay. And prior to that did there come a time that ASI terminated the contract?
> A. Yes.
> Q. Do you remember whose decision it was finally to terminate the contract?
> A. Mine.
> Q. Take a look at Plaintiff's Exhibits No. 11. What is that?
> A. This is the letter or notification that was sent

8

>     out in April 7 to Southeast Airlines.
> Q.  April 7 of what year?
> A.  2003. Notifying Southeast Airlines that it
>     terminate [text omitted].

(Sugrue Aff., Ex. C at 2:15-26.)

Two days subsequent, on December 10, 2004, Defendant's witness, Mordechai Hadsay testified in response to questions about a meeting he attended in Florida with Southeast employees that "[w]e were advised that they are not happy with the contract and they are not going - - continuing with it." (Kolatch Aff., Ex. E at 40:9-10.)

On April 10, 2006, JODA initiated this action for breach of contract, contending that despite terminating the T3 Agreement on April 7, 2003, "[a]t no time did Defendant provide notice to Plaintiff of Defendant's intention to terminate the [T3] Agreement, as required by the Letter Agreement." (Compl. ¶ 16.) JODA moves for partial summary judgment with respect to the issue of Defendant's liability under the Letter Agreement.

## II. DISCUSSION

A.  Standard of Law

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party

9

is entitled to judgment as a matter of law.  Fed R. Civ. P. 56(c); see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000).  Genuine issues of material fact cannot be created by mere conclusory allegations; summary judgment is appropriate only when, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party."  Heublen v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (citing Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).

In assessing when summary judgment should be granted, there must be more than a 'scintilla of evidence' in the non-movant's favor; there must be evidence upon which a fact-finder could reasonably find for the non-movant."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  While a court must always "resolv[e] ambiguities and draw[ ] reasonable inferences against the moving party," Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson ), the nonmovant may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  Id. at 12. Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts

10

showing that there is a genuine issue for trial.'" Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting Fed.R.Civ.P. 56(e)). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Unsupported allegations in the pleadings thus cannot create a material issue of fact. Id.

Defendant contends that genuine issues of material fact remain as to (1) the authenticity of the Letter Agreement, (2) whether there was consideration for the Letter Agreement, (3) whether Defendant breached the Letter Agreement, and (4) whether JODA was injured by Defendant's alleged breach of the Letter Agreement.

B.  Choice of Law

"[F]ederal court[s] sitting in diversity jurisdiction pursuant to 28 U.S.C. § 1332 must apply the choice of law rules of the forum state, i.e., New York." Oldcastle Precast, Inc. v. U.S. Fidelity & Guar. Co., 458 F.Supp.2d 131, 141 n.10 (S.D.N.Y. 2006)(citing Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1538 (2d Cir. 1997)). In determining which law applies in a contract case, New York applies the "center of gravity" or "group of contacts" approach, under which a "court

11

may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." Id. (citing Lazard Freres, 108 F.3d at 1539).

Here, JODA's place of incorporation and principal place of business is Missouri, (Plt.'s 56.1 Stmt., ¶ 1), Defendant is a Delaware Corporation, which at the time of the Letter Agreement had its principal places of business in Israel and Ohio, (Guttman Decl. ¶ 7.), and Southeast has its place of business in Largo, Flordia. (Guttman Decl. ¶ 8.)  There is no evidence of any location where all of the 'subject matter' of the contract is located, given that the subject matter of the Letter Agreement includes the aircraft, the engine reserves, and the rights to cure and service of the T3 Agreement, only one of which is a physical entity and none of which can be said to be located in any particular state.  For the same reason, there is no way to conceptualize a single location where the contract was to be performed, nor is there evidence as to where the contract was negotiated.  Given Defendant's place of business in Ohio, and the fact that the Letter Agreement was signed, executed, and sent from Cincinnati, Ohio, the Court finds Ohio to be the center of gravity of the Letter Agreement.  Accordingly, the Court will apply Ohio law in resolving the breach of contract claim.

C.   Breach of Contract Claim

Under Ohio law, to prevail on a claim for breach of contract, JODA must prove four elements: "(1) the existence of and terms of a contract; (2) performance by [JODA] under the contract; (3) [Defendant]'s breach of the contract; and (4) damages or loss caused by the breach. Klaus v. Hilb, Rogal & Hamilton Co. of Ohio, 437 F.Supp.2d 706, 730 (S.D. Ohio 2006) (citing Samadder v. DMF of Ohio, Inc., 798 N.E.2d 1141, 1147 (2003)).

Under Ohio law, the "construction of a written contract is a matter of law" and the Court's "primary role is to ascertain and give effect to the intent of the parties." Saunders v. Mortensen, 801 N.E.2d 452, 454 (2004) (citing Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos., 714 N.E.2d 898, 900 (1999)). However, "[w]hen the terms included in an existing contract are clear and unambiguous, [the Court] cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract." Hamilton Ins. Serv., 714 N.E.2d, at 901. "Summary judgment ordinarily is appropriate in a contract action when the language of the contract is unambiguous, or, if the language is ambiguous, where extrinsic evidence leaves no genuine issue of material fact and permits interpretation of the agreement as a matter of law." Sullivan v. Cap Gemini Ernst & Young U.S., 518 F.Supp.2d 983, 994 (N.D.Ohio 2007)(citing UAW

Local 540 v. BVR Liquidating, Inc., 190 F.3d 768, 772 (6th Cir. 1999)).

Defendant contends that there is a genuine issue of material fact as to the existence of damages from the breach of the Letter Agreement. (Def's Mem. Law, 23-24.) Under Ohio law, "summary judgment may be granted to the defendant in a breach of contract case where the plaintiff has failed to provide evidence of economic damages resulting from a breach of contract and has failed to seek injunctive relief or specific performance of a contractual duty . . . " Hicks v Bryan Medical Group, Inc., 287 F.Supp.2d 795, 806 n.6 (N.D. Ohio 2003) (citing DeCastro v. Wellston City School Dist. Bd. Of Edn., 761 N.E.2d 612, 617 (2002)). While the parties in this matter are before the Court on Plaintiff's motion rather than Defendant's, ASI is correct that damages are an element of a claim for breach of contract that must be proven by Plaintiff.

Here, ASI is correct that JODA has not alleged, let alone provided any evidence to support, how it was damaged as a result of Defendant's failure to notify it of the termination of the T3 Agreement. (Def's Mem. Law, 23.) On that basis alone, Plaintiff's Motion for Summary Judgment is DENIED.

Additionally, Defendant seeks discovery. (Def's Mem. Law, 8-10; Kolatch Aff., ¶¶ 9-11.) Accordingly, discovery in this matter, including expert and fact discovery, and particularly

14

addressing the issue of damages, shall be completed within 90 days of the date of this Order. There shall be no extensions. The Court will hold a status conference in this matter on January 15, 2010, at 11:30 AM.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's Motions for Summary Judgment is DENIED.

SO ORDERED.

Dated:   New York, New York
         September 29, 2009

                                              *Deborah A. Batts*
                                           Deborah A. Batts
                                           United States District Judge